IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Carrie B. Woodley, | ) | C/A No.1: 09-2026-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of Social Security | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be remanded for further administrative action.

I.     Relevant Background

    A.    Procedural History

Plaintiff filed an application for DIB on November 25, 2005, alleging disability as of January 16, 2004. Tr. at 118–22. The state agency and the Social Security Administration denied Plaintiff's application initially and upon reconsideration. Tr. at

62–68, 72–74. After a hearing on November 18, 2008 before Administrative Law Judge Gregory M. Hamel ("the ALJ"), at which Plaintiff, her non-attorney representative Ronald Douthit, and Vocational Expert ("VE") Robert Branham, Ph.D. appeared, the ALJ issued his decision on February 9, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 22–61 (hr'g Tr.), Tr. at 9–21 (decision). After the Appeals Council denied Plaintiff's request for review of the hearing decision on May 29, 2009, the ALJ's decision became the final decision of the Commissioner. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on July 31, 2009, pursuant to § 205(g) of the Act, 42 U.S.C. § 405(g).

B.    Plaintiff's Background and Medical History

Plaintiff was 49 years old as of the ALJ's 2009 decision. Tr. at 118. She has a high school education and additional training in child care, and her past relevant work ("PRW") was as a medical assistant and as a child care provider. Tr. at 19, 151–62.

1.    Medical Evidence

In April 2003, Plaintiff saw primary care physician Betty Obong, M.D. with complaints of left shoulder pain, muscle aches, and joint pain. Tr. at 244. Dr. Obong examined Plaintiff and found that Plaintiff experienced pain when trying to lift or rotate her left shoulder and that she could only lift the shoulder 20 degrees. Tr. at 244. She diagnosed Plaintiff with arthritis and tendinitis, prescribed an anti-inflammatory medication, and referred her to an orthopedist. Tr. at 244–45.

In January 2004, Plaintiff had ovarian cysts surgically removed. Tr. at 214–25, 269–70, 285–92.

In May 2004, Plaintiff saw Dr. Obong with depressive symptoms, including decreased appetite, sleep disturbances, decreased energy, and increase crying spells. She diagnosed "stress," and prescribed medication, counseling, and regular exercise. Tr. 238–39. On August 12, 2004, Dr. Obong diagnosed Plaintiff with a ventral hernia. Tr. at 236–37. Dr. Obong also diagnosed her with a frozen shoulder and recommended that she see an orthopedist if the symptoms persisted. Tr. at 237.

On August 23, 2004, Plaintiff saw orthopedist John Ernst, M.D., with complaints of ongoing pain in her left shoulder. His examination showed tenderness of the shoulder, limited range of motion, and signs of impingement. Tr. at 299. His exam revealed her rotator cuff function to be intact and that she had symmetrical muscle bulk, and no atrophy. Dr. Ernst reviewed x-rays and diagnosed left shoulder impingement and bursitis with mild adhesive capsulitis, chronic subacromial compression, and good rotator cuff function. He injected Plaintiff's shoulder and recommended exercises and anti-inflammatory medications. Tr. at 299–30.

At a follow-up visit on September 20, 2004, Dr. Ernst examined Plaintiff and found that her shoulder was improving after the injection. Tr. at 300. On October 11, 2004, Dr. Ernst indicated Plaintiff continued to have residual subacromial impingement and bursitis. Tr. at 301. He instructed her to continue with anti-inflammatory medications and to continue exercising the shoulder. Tr. at 301.

On October 20, 2004, Plaintiff had an MRI of her left shoulder, which showed a tear of her supraspinatus tendon with mild muscle atrophy and fraying and a tear of her infraspinatus tendon with mild joint arthropathy. Tr. at 302. On exam, Dr. Ernst found tenderness to the periacromial area with painful arc above 60 degrees on range of motion. Tr. at 302. He recommended shoulder arthroscopy with debridement and probable rotator cuff repair, depending upon operative findings. Tr. at 302.

Plaintiff had the recommended arthroscopic surgery on November 16, 2004. On November 17, 2004, at her post-operative examination, Dr. Ernst noted the left shoulder diagnostic arthroscopy with "large rotator cuff tear and repair, majority of the supraspinatus, intraarticular debridement, subacromial bursectoym and acromioplasty." Tr. at 302. He instructed Plaintiff on passive movement and told her she would start therapy. Tr. at 302. At her November 29, 2004 follow-up visit to Dr. Ernst, Plaintiff was progressing and showed no signs of infection. Tr. at 303. Dr. Ernst emphasized the importance of no active movement and told her "to work more aggressively on passive therapy." Tr. at 303.

In December 2004, Plaintiff saw Dr. Obong with complaints of painful swelling in her upper scapular area. Tr. at 232. She found a "a 3cm cystic area" in Plaintiff's left shoulder and referred Plaintiff to another doctor to have the cysts removed. Tr. at 232–33. Plaintiff had the cysts removed on December 17, 2004. Tr. at 279–84.

Dr. Ernst noted that Plaintiff was progressing, steadily improving, and doing well between December 2004 and March 2005. Tr. at 303–05.

In August 2005, Plaintiff saw Dr. Obong concerning a severe headache that had lasted for three days. Tr. at 230–31. Dr. Obong ordered a CT scan, but it was unremarkable. Tr. at 267. Plaintiff again saw Dr. Obong in November 2005 with complaints of persistent numbness and tingling in her left hand. Tr. at 228. Dr. Obong suspected carpal tunnel syndrome, prescribed a wrist splint, and referred her to a neurologist. Tr. 228–29.

Plaintiff saw neurologist John Plyler, M.D., on November 9, 2005, with complaints of left shoulder pain and numbness in her face and left side at times. Tr. at 310–11. Nerve conduction studies of her left arm were normal, and on examination, she was alert and oriented with some limitation of motion and complaints of discomfort, and some muscle spasm in her neck. Tr. at 310. On November 29, 2005, she returned to Dr. Plyler and reported "some numbness patchy in the face area as well as a numb feeling in the arm sometimes." Tr. at 319. Dr. Plyler examined her and noted there had been little change in her physical condition, that she had a flat affect, and that she was guarding the left shoulder. Tr. at 319. Dr. Plyler recommended MRIs of the cervical spine, left plexus, and brain, as well as EMG nerve studies and an ultrasound. Tr. at 310–11. These tests revealed a rotator cuff tear of the left shoulder and minor arthritic changes in the neck. Tr. 274, 276, 278, 306, 311–14, 407–08, 410, 416–20.

In December 2005, Plaintiff still complained of numbness on the left side of her face, shoulder, and arm and some discomfort in the shoulder and neck area. Dr. Plyler examined her and noted she showed no cranial nerve palsy, limited range of motion in the

left shoulder, and tenderness in back of her hand. He ordered tests to exclude a vascular abnormality. Tr. at 318, 409, *see* Tr. 296, 404.

On January 9, 2006, Plaintiff followed up with Dr. Ernst, who noted that vascular studies had ruled out plexopathy and cervical disease, and that she had normal sensory and motor latencies. She complained of diffuse shoulder aching with numbness in the left side of her face. Dr. Ernst examined Plaintiff and diagnosed chronic rotator cuff disease (post repair) with subacromial changes. He also noted that Plaintiff's symptoms were "somewhat disproportionate" and recommended that Plaintiff follow up with Dr. Plyler. Tr. at 306–07.

On January 23, 2006, she saw Dr. Plyler and told him she had experienced one or two "somewhat throbbing" headaches since her last visit, and that she was still having problems with her shoulder. Tr. at 314. On examination, she had guarding with range of motion, but was alert and oriented with no neurological deficits or cranial nerve palsy. Dr. Plyler recommended blood work. Tr. at 314. Plaintiff returned on February 21, 2006, for follow up with Dr. Plyler. Tr. at 315. He noted that her lab work was "unrevealing." Tr. at 315. She told him her neck pain and headaches were somewhat better. Tr. at 315. She was tearful and depressed but did not discuss it with Dr. Plyler. Tr. at 315.

On February 22, 2006, Plaintiff saw psychiatrist Peter Nylor, M.D., with problems dealing with the death of mother and grandmother, her marriage, and her health. Tr. at 326–27. On examination, Dr. Nylor found Plaintiff had a depressed mood, a tearful affect, average intelligence, and fair insight and judgment. Tr. at 325. He started her on

Zoloft, an antidepressant. Tr. at 325. On follow up in March, Dr. Nylor noted that Ms. Woodley experienced mild nausea with Zoloft. Tr. at 321. She scored poorly on tests for memory and concentration. Tr. at 321. Dr. Nylor diagnosed a major depressive disorder. Tr. 322–27. Plaintiff returned on March 8, 2006, and Dr. Nylor noted that Plaintiff's mood had been better over the past couple days, and that she had no suicidal ideation. Tr. at 321.

On March 6, 2006, Plaintiff saw orthopedic surgeon James McIntosh, M.D. Tr. at 354. She told him that her diabetes was reasonably controlled, but that her left shoulder pain was barely tolerable and that she could not perform the activities of daily living. Tr. at 354. She indicated she did not have any numbness or tingling. Tr. at 354. On examination, Dr. McIntosh reported atrophy to left anterior shoulder with tenderness to palpation of her shoulder with very limited range of motion and some slight stocking-like numbness, but no cervical pain with nearly full range of motion in her neck. X-rays showed mild joint arthritis with a small spur, possible cystic changes, and no evidence of significant muscle atrophy. Dr. McIntosh diagnosed a persistent rotator cuff tear with adhesive capsulitis. Tr. at 354–55. Dr. McIntosh reviewed x-rays, which revealed Type 1 acromial and mild AC joint arthritis with a small anterior acromial spur at the humeral head. Tr. at 363. He recommended surgery, but explained to Plaintiff that it may not relieve all of her symptoms. Tr. at 355. Specifically, he noted the following:

> This presents a very difficult problem. [Plaintiff] has very stiff, painful shoulder and it is probably producing most of her pain. Unfortunately, with a fair amount of patients who are diabetic, you can go in, release the capsule, get reasonable motion at the time of the procedure, but they will

contract down. My recommendation is to proceed with the arthroscopy, release the capsule, and attempt a repair through the scope.

Tr. at 355.

On March 16, 2006, Dr. McIntosh performed that surgery, a left shoulder arthroscopy/debridement/capsular release/open rotator cuff repair. Tr. at 330–35. Plaintiff saw Dr. McIntosh in follow up, and he noted that she was making some progress and that her pain was fairly well-controlled. Tr. at 353. He recommended she resume therapy and exercise. Tr. at 353.

In April 2006, Seham El Ibiary, M.D., a state agency physician, reviewed the evidence and found Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; sit and stand/walk about six hours each in an eight-hour day; occasionally climb ladders, ropes, or scaffolds and crawl; frequently climb ramps and stairs, balance, stoop, kneel, and crouch. He also found she should avoid constant use of left upper extremity, frequent overhead reaching with left arm, and concentrated exposure to hazards. Tr. at 336–43.

In April 2006, Brian West, Ph.D., conducted a psychological evaluation of Plaintiff. Tr. at 344–47. He concluded that she "ha[d] a clear pattern of attention regulation concerns" most likely associated with sleep disturbance; "anxiety and depressive concerns," including a depressive episode and a post-traumatic stress disorder ("PTSD") of unknown origin; and "a blunted learning curve" affecting her ability to recall. Tr. at 344–47.

In April and May 2006, Dr. McIntosh noted that Plaintiff was making progress with her shoulder, that she had "reasonable strength" in her right rotator cuff insertion,

but that she was tender in that area and would take "some time" to recover. Tr. at 351–52, 360–61.

In June 2006, Plaintiff saw Dr. Plyler and told him she still had some discomfort. Tr. at 395. He observed that she looked better, was pleasant and more animated upon examination. Tr. at 395.

On July 10, 2006, Plaintiff again saw Dr. McIntosh and told him she had worsening shoulder pain and said she had pain involving "just about every joint in her body." Tr. at 350. He examined her and found shoulder tenderness and crepitance (popping sounds), but improved motion in her shoulder and no swelling. Tr. at 350. Dr. McIntosh stated she was making progress and should continue her exercise program and anti-inflammatory medications. Tr. at 350. Plaintiff saw Dr. McIntosh again in September 2006, and indicated that she was "doing a little bit better with her shoulder," but still had a "fair amount of pain and discomfort with activities." Tr. at 349. On examination, Dr. McIntosh found improved range of motion and "very good" strength. Tr. at 349. He noted that Plaintiff "jump[ed] a lot," which he believed to be "secondary to symptom exaggeration." Tr. at 349, 358.

On September 12, 2006, Plaintiff saw rheumatologist Gary Fink, M.D. with complaints of joint pain. She had good grip strength in her right hand and fair grip strength in her left hand. X-rays of her feet, hands, and right shoulder were negative. He prescribed sleep medication. Tr. at 368–73, 382–87, 389. She returned to Dr. Fink on September 26, 2006 and again on October 17, 2006, and told him the medication was

helping. Tr. at 366–67.  Dr. Fink prescribed a medication for headaches, which also helped.  Tr. at 366-67.

On October 2, 2006, Dr. Fink wrote a letter to Dr. Obong and explained that Plaintiff's blood work had been unremarkable and that, on physical examination, he noted a decreased range of motion in the left shoulder and tenderness in the muscles.  Tr. at 388. Dr. Fink assessed Plaintiff's condition as consistent with fibromyalgia, exacerbated by stress.  Tr. at 388.  He emphasized the importance of exercise and stress reduction, and opined that she should get better with treatment.  Tr. at 388.  He also noted that she appeared motivated to get better.  Tr. at 388.

Plaintiff saw Dr. Plyler again on October 23, 2006. Tr. at 375.  He noted her continued complaints of headaches and shoulder pain. Tr. at 375. He noted that neuropsych testing showed major depression and post-traumatic stress, and he indicated that her mood was "down." Tr. at 375.  He also noted that imaging showed arthritic disease of the spine and a rotator cuff tear, and that a brain CTA was negative. Tr. at 375. On examination, Dr. Plyler found Plaintiff to be a little anxious, but noted that she had a normal gait, intact cranial nerves, and normal reflexes.  Tr. at 375.  He noted that she had chronic headaches, rotator cuff issues, depression and affective disorder, and probable fibromyalgia.  Tr. at 375.  He prescribed medications.  Tr. at 375.

Reports from Plaintiff's November 2006 and January 2007 visits to Dr. Fink indicated that medication was helping her headaches, that she was sleeping a little better,

that her fibromyalgia was overall "ok," and that she had been walking for exercise. Tr. at 378–79.

In February 2007, Plaintiff followed up with Dr. Obong for her diabetes and for complaints of pain and limited motion in her left shoulder and diffuse arthralgias. Tr. at 426–27. Dr. Obong noted that Plaintiff's blood sugar was high, and she assessed Plaintiff with fibromyalgia and a frozen left shoulder, and recommended water aerobics or bike riding for exercise. Tr. 426–27.

On February 22, 2007, Plaintiff followed up with Dr. Plyler, who noted that Plaintiff was "still down some, but improving," and that she was having "a little trouble sleeping" and had "tight, squeezing headaches at times," sometimes with a "throbbing component." Tr. at 392. He also noted that her musculoskeletal discomfort was improved overall, and that she was not having any more patchy numb feelings. On examination, she was pleasant and smiling and had intact cranial nerves, a normal gait, normal reflexes, and some scattered trigger points in her neck and shoulder area. Tr. at 392.

In March 2007, Plaintiff saw Dr. Obong with complaints of acute-onset pain in her lower back that had lasted for three days. Tr. at 424–25. Dr. Obong noted Plaintiff was tender around her SI joint, experienced pain on anterior flexion, and had difficulty getting to her feet. Tr. at 424–25. She prescribed steroid and pain medications. Tr. at 424–25.

In April 2007, state agency physician William Cain, M.D., reviewed all the evidence and completed a physical residual functional capacity ("RFC") form. He opined

that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand/walk or sit about six hours each in an eight-hour workday; frequently climb ramps and stairs, balance, stoop, kneel, and crouch; and occasionally climb ladders/ropes/scaffolds and crawl. He found she had a limited ability push/pull with her left arm and should avoid frequent overhead reaching with her left arm and concentrated exposure to hazards. Tr. at 453–60.

Plaintiff saw Dr. Fink on April 10, 2007 for a routine visit and complained of a "slipped disc." Tr. 470. He ordered an MRI of her low back, which was taken a few days later. Tr. at 472–73. The MRI showed a small disc protrusion and annular tear at L4-L5 with mild narrowing; a small disc protrusion at L5-S1 with mild nerve root effacement; and a broad diffuse disc bulge at L3-L4 with mild narrowing. Tr. 472–73. She saw Dr. Fink again on April 20, 2007, with complaints of pain in her left thumb, wrist, and forearm, as well as in her lower back. Tr. at 469. When she returned to Dr. Fink on May 8, 2007, they discussed her physical condition, and he noted that he did not "see source of disability in fibromyalgia." Tr. at 466–68.

On April 3, 2007, state agency psychologist Judith Von, Ph.D. reviewed the evidence and found Plaintiff had "mild" limitations in daily activities, social functioning, and concentration, persistence, and pace with no extended episodes of decompensation and, thus, did not have a severe mental impairment. Tr. at 439, 449.

In May 2007, Dr. Nylor completed a form stating that Plaintiff's mental impairments caused "marked" and "extreme" limitations and had caused one or two

episodes of extended decompensation under the B-criteria of Listing 12.04. He also indicated that Plaintiff satisfied the C-criteria. Tr. at 476–79. On an RFC form, he opined that Plaintiff had several "moderate" and "marked" limitations. Tr. at 480–81.

On May 1, 2007, Plaintiff saw Dr. Nylor, who noted she had a variable mood, a depressed affect, and poor memory. Tr. at 484. Dr. Nylor increased the Zoloft dosage he prescribed to treat her depression. Tr. at 484. Two weeks later, Dr. Nylor noted she tolerated the increased dosage well and had a better mood, decreased irritability, and no suicidal ideation. Tr. at 483. When Plaintiff again saw Dr. Nylor on May 28, 2007, he noted that her mood was "still ok" and that she had a constricted affect and no suicidal ideation. Tr. at 482.

In May 2007, Norma Lynn Higgins, L.S.W. assessed Plaintiff with "mild" limitations in activities of daily living; "marked" difficulties in social functioning; "marked" deficiencies in concentration, persistence, and pace; and three episodes of decompensation under the B-criteria of the Listings, and also met the C-criteria. Tr. at 496–99. On an RFC form, she opined Plaintiff had several "moderate" and "marked" mental limitations. Tr. 501–02. She also opined that Plaintiff could not perform light or sedentary work and that her impairments affected her ability to concentrate for prolonged periods. Tr. at 494. In June 2007, Ms. Higgins wrote a letter indicating that she had been seeing Plaintiff since March 2006 for psychotherapy and that Plaintiff's prognosis was "guarded." Tr. at 493.

On June 5, 2007, Dr. Obong wrote a letter opinion that Plaintiff could not lift, reach, perform fine manipulation, bend, stoop, or walk for long periods of time, and that her fibromyalgia affected her ability to sustain employment. Tr. at 507. On June 11, 2007, Dr. Obong completed a Physical Effects of Pain Questionnaire in which she reported that Ms. Woodley suffered from pain caused by cervical disc disease, left shoulder rotator cuff tear/repair, and frozen shoulder. Tr. at 504. Dr. Obong opined that Plaintiff's pain would prevent her from "working full time at even a sedentary position." Tr. at 504. She further opined that Plaintiff would be unable to perform "light" or "sedentary" work as those terms are defined in the Dictionary of Occupational Titles ("DOT") and that Plaintiff's symptoms would "affect her ability to perform work requiring prolonged concentration or close attention to detail." Tr. at 505.

On June 25, 2007, Plaintiff's overnight sleep study showed alpha (wave) intrusion, with a sleep latency test that was "near normal." Tr. at 514–16.

On June 26, 2007, Plaintiff returned to Dr. Nylor, who indicated that she was tolerating her medication well, that her mood had been "ok," and she had an appropriate affect, improved sleep, and no suicidal ideation. Tr. at 609.

In July 2007, Plaintiff saw rheumatologist Carlyle Barfield, M.D. who injected her right hand for complaints "of triggering of the right first finger." Tr. at 525. Dr. Barfield indicated that this markedly improved, but did not resolve, her generalized pain. Tr. at 525. He further noted that she was not sleeping better, but that her fatigue and her depression were a little better. Tr. at 525. On September 18, 2007, she again saw Dr.

Barfield, who indicated that her Plaintiff's sleep was better; her fatigue was present, but not on a daily basis; her depression was good at times; and that her generalized pain was improved, although she had trouble with her trigger finger. Tr. at 525. Dr. Barfield observed mild swelling of medial left wrist and positive Finkelstein's test, and she diagnosed de Quervain's syndrome (inflammation of the tendons on the thumb side of the wrist) and gave Plaintiff an injection in her left medial wrist tendon area. Tr. at 525.

In August 2007, Dr. Nylor noted that Plaintiff's mood had been fair, and that she had variable depression symptoms, complaints of low energy, and no suicidal ideation. Tr. at 608. When Plaintiff returned to Dr. Nylor in September 2007, he noted that the prescribed medication had been helpful in that Plaintiff was somewhat less depressed, had an appropriate affect, and no suicidal ideation. Tr. at 607. In October 2007, she had a fair mood, appropriate affect, and no suicidal ideation. Tr. at 606.

On October 4, 2007, Dr. Obong prescribed medication for Plaintiff's complaints of low back pain with weakness. Tr. at 580–81. Two weeks later, Dr. Plyler noted that Plaintiff was feeling better overall, that her depression varied, and that her headaches were better. Tr. at 542. Plaintiff indicated she still had tingling in her extremities, but that her face discomfort was better. Tr. at 542. On examination, Dr. Plyler noted Plaintiff was more pleasant and upbeat. Tr. at 542. He noted she had tenderness in her neck and shoulder muscles, symmetrical reflexes, and no lateralizing cranial nerve findings. Tr. at 542. Dr. Plyler recommended nerve conduction studies, which were normal. Tr. at 600–01. Dr. Plyler also ordered other tests, including a brain MRI, which was taken on

November 9, 2007, and showed subtle white matter changes most likely nonspecific. Tr. at 575. A neck MRI appeared to show normal alignment with a possible small herniation at C3-4 and disc bulge at C4-5 without significant canal compromise. Tr. at 576. A November 19, 2007 EEG and nerve study of Plaintiff's right arm were normal. Tr. at 572, 574. Dr. Plyler's examination on that day indicated that Plaintiff was pleasant, alert, and a little more upbeat. Tr. at 573. He noted she had tenderness in her neck and shoulder muscles, decreased grip strength, and complained of pain in the joints of the hand and thumb. Tr. at 573. He also noted she had a normal gait, normal reflexes, and intact pulses. Tr. at 573.

On November 27, 2007, Plaintiff saw orthopedist Timothy Allen, M.D. for a surgical consultation regarding her hands and wrists. Tr. at 520–21. She was oriented, in no acute distress, and had an appropriate mood and affect. Tr. at 520–21. Following an examination of her hands, Dr. Allen diagnosed a right-sided trigger thumb, a left-sided de Quervain's tenosynovitis, and bilateral carpal tunnel syndrome, and indicated Plaintiff wished to have surgery to address these issues. Tr. 520–21. On December 11, 2007, Dr. Allen saw Plaintiff for her preoperative consultation and noted surgery would be performed on December 19, 2007. Tr. at 520–21. He further noted that she had paresthesias into the right thumb and index finger as well as tenderness along the flexor aspect of the right thumb along the A1 pulley, and at the base of her thumb joint dorsally. Tr. at 520. He performed surgery on her right wrist on December 19, 2007. Tr. 547.

Also in December 2007, Plaintiff saw Dr. Nylor, who indicated that her mood was "ok" and that she was sleeping better. Tr. at 606. He also found that she also had an appropriate affect and no suicidal ideation. Tr. at 606.

Plaintiff saw Dr. Allen on January 3, 2008 for her post-operative check-up, and he noted that the triggering of Plaintiff's thumb was gone, and that her carpal tunnel symptoms were much better. Tr. at 547. He restricted her to "light duty" and told her to continue wearing her brace part-time and doing home exercises. Tr. at 546–47. Plaintiff again saw Dr. Allen on January 24, 2008 to discuss issues with her left wrist. Tr. at 546–47. They determined she would have surgery on that wrist to release her de Quervain's tenosynovitis. Tr. at 544–45.

Dr. Allen performed surgery on Plaintiff's left wrist in February 2008. Tr. at 548–49. By the end of the month, she was doing well, with no significant pain, very mild swelling, good thumb range of motion, and functioning sensory nerves. Tr. at 544.

Plaintiff saw Dr. Barfield on January 28, 2008 with complaints of low grade generalized pain and variable depression. Tr. at 552. She returned on February 29, 2008, noting that she had been sleeping poorly and was fatigued, depressed, with a little pain. Dr. Barfield advised Plaintiff to continue taking Lyrica and also prescribed Flexiril. Tr. at 552.

When Plaintiff returned to Dr. Nylor in January 2008, her mood was "ok," and he noted she had an appropriate affect and no suicidal ideation. Tr. at 605. At Plaintiff's

June 2008 visit, Dr. Nylor noted that she was tolerating her medications well and had no suicidal ideation. Tr. at 604.

On April 17, 2008, Plaintiff saw Dr. Plyer and indicated she had not had any severe headaches or blackouts, but that she was still having some twitching around her left eye. Tr. at 571. He examined her, found she was pleasant and smiling and complained of slight numbness in her left thumb. Tr. at 571. He noted no lateralizing cranial nerve findings and no facial twitch. Tr. at 571. Dr. Plyler recommended an EEG, which was normal. Tr. at 568, 571. Plaintiff also had a carotid ultrasound, which was normal. Tr. at 570. Dr. Plyler questioned whether Plaintiff's symptoms could be related to medications. Tr. at 571. Plaintiff returned to Dr. Plyler on May 1, 2008, with complaints of intermittent left peri-orbital twitching. Tr. at 569. He noted she was pleasant and smiling and that her cranial nerves were intact, and he ordered additional testing, including an MRA of the brain to evaluate the blood vessels. Tr. at 569. The MRA was performed and did not reveal evidence of any aneurysm or stenosis. Tr. at 566.

On June 10, 2008, Plaintiff saw Dr. Barfield, who noted that Plaintiff's sleep was variable, but improved overall. Tr. at 551. He further noted her pain had been "great" in general, but that it remained present at times—mainly in the early morning and late afternoon. Tr. at 551. Plaintiff also admitted depression. Tr. at 551. On June 11, 2008, Plaintiff again saw Dr. Plyler, who noted that her twitching was improved, that she was smiling and pleasant and had no twitch, neurological deficits or lateralizing cranial nerve findings. Tr. at 565.

On July 1, 2008, Plaintiff returned to Dr. Plyler with a "major flare of the twitching." Tr. at 559. Dr. Plyler ordered several tests. Tr. at 559. A July 16, 2008 MRI revealed the following: 1) small disc bulge to the right at the C4-5 level with bilateral foramen narrowing, 2) small disc protrusion to C6-7 with effacement of the cord and no significant central canal or neural foramen narrowing, and 3) heterogeneous thyroid isthmus nodule. He recommended further evaluation of the thyroid. Tr. at 557–58. Nerve studies were normal. Tr. at 560–61.

On August 1, 2008, Plaintiff had a thyroid ultrasound, which showed mild thyromegaly (an enlarged thyroid) with cysts. Tr. 554. Specialist Matthew Scarlett, M.D. advised Plaintiff to have another ultrasound of her thyroid in six months. Tr. 594–95.

Plaintiff also saw Dr. Nylor in August 2008 and told him that her mood had been "ok, pretty good," and that her sleep was fair on medications. Tr. at 603. She saw him again in October 2008, and she continued to have an "ok" mood, an appropriate affect, and no suicidal ideation. Tr. at 611. Also in October 2008, Dr. Nylor responded to a question that asked him whether there had been an appreciable change in Plaintiff's condition since he had completed the questionnaire in May 2007. Tr. at 612. He indicated that Plaintiff's condition had changed in that her "mood had improved." Tr. at 612.

Subsequent to the ALJ's decision, Plaintiff submitted additional evidence from Dr. Obong. In a March 27, 2009 letter, Dr. Obong opined that Plaintiff had "severe symptoms of fibromyalgia" and continued to deteriorate. Tr. at 619. She said these symptoms,

along with her shoulder symptoms, made Plaintiff "unable to be gainfully employed." Tr. at 619.

### 2. Plaintiff's Reports and Testimony

On March 29, 2007, Plaintiff completed a function report. Tr. at 431–38. She said she dressed herself and did household chores on the days she felt well, but not on the days she did not feel well. She said she read, shopped, prepared simple meals, drove short distances, spent time with her husband and son, and paid bills online or by mail. She said she had to write things down to remember them. She said she never felt fully rested and sometimes had debilitating headaches. She indicated that pain from fibromyalgia sometimes awakened her at night and made it difficult for her to return to sleep. Tr. at 431–32. She said she could not work, sew, garden, drive for long periods, or sit for long periods, and that pain made daily activities difficult. She said she could walk 50 feet, go out alone, count change, and handle bank accounts. She said she had to change positions frequently when she used her computer, and that she enjoyed reading and listening to music. She said she had no problems getting along with others, but did not like to be around people anymore. She said she had no problems understanding, but needed to have instructions repeated. Tr. 431–38.

At the administrative hearing on November 18, 2008, Plaintiff testified that her alleged onset of disability date, January 16, 2004, was the day she last worked. Tr. at 28. She said that job ended when she had to have surgery for ovarian fibroids and was diagnosed with diabetes. Tr. at 28. She indicated that she was left-handed. Tr. at 30. She

said left shoulder pain and difficulty lifting prevented her from working, and that fibromyalgia and depression contributed to her disability. Tr. at 29–30. She said her shoulder did not really improve after her surgeries. Tr. at 38–41. She said she also had problems with her low back, hip, and feet. Tr. at 41–42. She said she was first diagnosed with diabetes in 2003, and that it was fairly well-controlled with medications and a diabetic diet. Tr. at 43. She said she was diagnosed with fibromyalgia the prior year, and that it caused "pain all over," although the medications helped some. Tr. at 43–44. She said she still sometimes had sleep problems even with medication. Tr. at 37. She said her depression was "a whole lot better" than it was when she first started seeing Dr. Nylor. Tr. at 44. She said her wrist surgeries "relieved some of the pains," although her hands still ached. Tr. at 46.

Regarding daily activities, she said she spent most of her time at home reading religious books, and that she could do light housecleaning and cooking. Tr. 31–33. She said a friend sometimes took her to church, and that her son sometimes visited her. Tr. at 32. She said she drove short distances. Tr. at 33. She said she tried to walk twice a day. Tr. at 44. She said her husband did the shopping, and that he had recently taken her to see her father in Florida. Tr. at 33. She said she did not use her computer much because of stiff hands. Tr. at 37.

3.   VE Testimony

VE Robert Brabham testified that a hypothetical individual of Plaintiff's age and background with the following limitations, could perform unskilled light work in the

national economy, including the jobs of companion and mail clerk: light work (lifting a maximum of 20 pounds occasionally and 10 pounds frequently); no lifting more than five pounds with the left arm and only occasional fine manipulation with the left arm; occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; occasionally reach overhead with the left arm; cannot work around hazardous environments; and occasional public contact. Tr. at 50–54, 57–58. Dr. Brabham further testified that there would be unskilled sedentary jobs, including surveillance system monitor, that such an individual could perform. Tr. at 55–58. He testified that there would be no jobs for someone who needed to miss more than four days of work per month or take four-to-five unscheduled breaks per day. Tr. at 59.

C.    The Commissioner's Final Decision

The ALJ followed the Commissioner's five-step sequential evaluation process set forth at 20 C.F.R. § 404.1520 in determining that Plaintiff was not disabled. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date in January 2004. Tr. at 14. At steps two and three, the ALJ found that Plaintiff had the following severe impairments: cervical and lumbar disc disease, fibromyalgia, a history of left rotator cuff tear and de Quervain's tenosynovitis, diabetes, depression, and PTSD. Tr. at 14. He found that Plaintiff did not have an impairment or combination of impairments that satisfied an impairment listed at 20 C.F.R. pt. 404, subpt. P, app. 1 (the Listings), so as to be presumptively disabling. Tr. at 14–16. Prior to determining whether Plaintiff could perform her PRW, the ALJ assessed her RFC by

evaluating the medical evidence and her subjective complaints. Tr. at 16–19. The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Tr. at 17. After considering all of the evidence, the ALJ determined that Plaintiff was restricted to "light" work with the following restrictions: no overhead reaching with the left arm; no more than occasional manipulative functions with the left hand; no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling; no climbing of ropes, ladders, or scaffolds; and no more than occasional contact with the public. Tr. at 16. The ALJ concluded that this RFC precluded Plaintiff from performing her PRW. Tr. at 19. Based on VE testimony, the ALJ concluded that there were unskilled light jobs existing in significant numbers in the national economy that Plaintiff could perform despite her limitations, including mail clerk and companion. Tr. at 20. Accordingly, the ALJ concluded that Plaintiff was not disabled. Tr. at 21.

II.    Discussion

In her brief, Plaintiff argues that the Commissioner's findings are in error for the following reasons:

1) The ALJ failed to properly consider the combined effect of Plaintiff's multiple impairments;

2) The ALJ violated the Commissioner's rules and regulations in evaluating the opinion evidence; and

3) The ALJ's decision was not based on substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    ALJ Findings

In his February 9, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2009.

2.    The claimant has not engaged in substantial gainful activity since January 16, 2004, 2006, [sic], the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: cervical and lumbar disc disease, fibromyalgia, history of left rotator cuff tear and de Quervain's tenosynovitis, diabetes, depression, and posttraumatic stress disorder (20 CFR 404.1521 *et seq*.).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with occasional climbing, balancing, stooping, kneeling, crouching, crawling. She can never climb ropes, ladders, and scaffolds, reach overhead with left dominant extremity or perform more than occasional manipulative functions with this extremity. She is limited to work with only occasional public contact.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on June 9, 1959, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 16, 2004, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 14, 16, 19–21.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines "disability" as follows:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability

claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling (SSR) 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant

can perform despite the existence of impairments that prevent the return to PRW. *Id.* If the Commissioner satisfies its burden, the claimant must then establish that she is unable to perform other work. *Id.; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the

Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### C. Analysis

#### 1. The ALJ Did Not Adequately Consider Plaintiff's Combined Impairments.

Plaintiff's initial allegation of error is that the ALJ did not appropriately detail whether and how he considered her combined impairments in determining whether she was disabled. Plaintiff argues that this error requires remand. Pl.'s Br. 11–13. The court agrees.

Plaintiff claims that her combined impairments of cervical and lumbar disc disease, fibromyalgia, history of left rotator cuff tear, de Quervain's tenosynovitis, diabetes, depression, and PTSD, when taken together, should have caused the ALJ to find her disabled. Citing the seminal Fourth Circuit case on this issue, *Walker v. Bowen*, 889 F.2d 47 (4th Cir. 1989), Plaintiff argues that, although the ALJ analyzed her ailments and found that she suffered from multiple severe impairments, he did not analyze the combined effect of these impairments in determining whether she was disabled. She argues that her multiple impairments "synergistically serve to not only enhance the severity of each other but when considered together in totality" make her unable to "engage in the physical activity that regular and sustained work requires." Pl.'s Br. at 12.

Illustratively, Plaintiff points to the pre-surgery medical record of orthopedist Dr. McIntosh, who performed surgery on Plaintiff's left shoulder. Dr. McIntosh noted that Plaintiff's problem was "very difficult" because her shoulder problems could be impacted by her diabetes in that, even though surgery would be performed to "release the capsule" and provide some pain relief, her diabetes could impact the long-term success of that relief. Tr. at 364.

When, as here, a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d at 50; *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

The Commissioner initially argues that, because the ALJ undertook a detailed RFC analysis and consulted a VE in determining whether there were jobs Plaintiff could

perform, the *Walker* case "does not control here." Def.'s Br. at 16–17. The court

disagrees. *Walker* requires an articulated explanation by the ALJ that he considered each

of a claimant's impairments in combination and what impact the impairments' combined

effect had on the disability decision. Even a detailed discussion of each impairment

separately in explaining the claimant's RFC is insufficient. For example, in *Lemacks v.*

*Astrue*, 9:07-2438-RBH-BHH, 2008 WL 2510087 (D.S.C. May 29, 2008), *aff'd*, 2008

WL 2510040 (D.S.C. June 18, 2008), the court found remand necessary so that the ALJ

could provide "adequate explanation and evaluation" of his consideration of the

claimant's impairments in combination. 2008 WL 2510087 at *4. The court

acknowledged that the ALJ had discussed the plaintiff's severe impairments individually,

"examining relevant evidence and ascribing functional limitations reasonably produced."

*Id.* Nonetheless, the matter was remanded with instruction to the ALJ that he "examine

the combined effect of all of the plaintiff's impairments, severe and non-severe, and

explain why he considers that combined effect disabling or not." *Id.* The undersigned

recommends remand for the same reasons here.

Here, the ALJ failed to consider—or, at least failed to articulate whether and how

he considered—Plaintiff's multiple impairments together, thereby violating 20 C.F.R. §

404.1523, which provides as follows:

> Multiple Impairments. In determining whether your physical or mental
> impairment or impairments are of a sufficient medical severity that such
> impairment or impairments could be the basis of eligibility under the law,
> we will consider the combined effect of all of your impairments without
> regard to whether any such impairment, if considered separately, would be
> of sufficient severity. If we do find a medically severe combination of

impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

*Id.*

Citing to decisions in other circuits, the Commissioner alternatively argues that the ALJ properly considered Plaintiff's impairments in combination by considering them separately. Def.'s Br. 17–19. The law in the Fourth Circuit is clear: in-turn consideration of multiple impairments is insufficient. The underlying ALJ decision in *Walker* had included discussion of each of claimants' impairments separately, noting 'the effect or noneffect of each." 889 F.2d at 49–50. The Fourth Circuit overturned those ALJ findings because, although the ALJ "discussed each of claimant's impairments[, he] failed to analyze the cumulative effect the impairments had on the claimant's ability to work." *Id.* at 50.

Similarly, the ALJ's fragmented examination of Plaintiff's impairments in this matter is insufficient. The ALJ's preliminary discussion of the step-by-step analysis he is to undertake correctly indicates that he is to determine whether a claimant has an impairment or combination of impairments that is "severe" and that he is to consider "all of the claimant's impairments, including impairments that are not severe" in determining a claimant's RFC. Tr. at 13 (setting out his responsibilities under steps two and four). However, neither this statement of the standard, nor his generic declaration that "the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix

1 (20 CFR 404.1525 and 404.1526)" (Tr. at 14), is sufficient under the law. *See Walker*, 889 F.2d at 50 (such a "finding in itself, however, is not sufficient to foreclose disability.") Nowhere does the ALJ discuss how and whether he considered the combined cumulative effect of these limitations and whether, together, the limitations rendered her disabled. *See Walker*, 889 F.2d at 50 (holding ALJ must "adequately explain his or her evaluation of the combined effect of the impairments.").

Therefore, the undersigned recommends this matter be remanded to the ALJ so that he can examine the combined effect of all of Plaintiff's severe and non-severe impairments. In his decision on remand, the ALJ should explain his evaluation of the combined effect of Plaintiff's multiple impairments in accordance with Fourth Circuit law.

> 2.    The ALJ Did Not Adequately Consider the Opinions of Plaintiff's Medical Sources.

Next, Plaintiff alleges that the ALJ violated SSR 96–2p by affording no weight to the opinions of Plaintiff's treating medical sources—Drs. Obong and Nylor and Ms. Higgins. Pl.'s Br. at 13–15. SSR 96–2p provides that if a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" *See also* 20 C.F.R. § 404.1527(d) (setting out factors Commission is to consider in weighing medical opinions).

The Commissioner counters, first arguing that the ALJ's treatment of these opinions was proper in that the determination of whether a claimant is disabled is left to the Commissioner, not medical sources. The Commissioner then argues that, to the

extent the treating sources provided "'medical opinions' going to the nature and severity of Plaintiff's impairments," the ALJ properly considered them and provided adequate reasons for discounting them. Def.'s Br. at 19.

The Commissioner's first argument is legally accurate. Determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. *See* 20 C.F.R. § 404.1527(e) (noting certain opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance"). The ALJ did not err by discounting portions of opinions by Plaintiff's medical sources that purport to make such conclusions. The portion of Dr. Obong's opinion that found Plaintiff had a less than sedentary capacity for work and that she could not be "gainfully employed" was appropriately discounted by the ALJ. Similarly, the ALJ appropriately discounted the portions of the opinions of Dr. Nylor and Ms. Higgins that indicated Plaintiff satisfied the criteria for a Listed Impairment.

The Commissioner also argues that the ALJ gave adequate reasons for discounting the portions of the opinions of Drs. Obong and Nylor and Ms. Higgins that concern the nature and severity of Plaintiff's impairments. The court considers these opinions in turn.

a.    Dr. Obong

In a June 5, 2007 letter, Plaintiff's treating primary care physician, Dr. Obong, indicated that she had been treating Plaintiff since 2001 and that Plaintiff suffered from type II diabetes, left shoulder impingement syndrome, and fibromyalgia. Tr. at 507. She

noted that Plaintiff was left-hand dominant and opined that the pain and weakness in Plaintiff's left arm rendered her unable to lift, reach, or perform fine manipulation.  Tr. at 507.  Dr. Obong also opined that Plaintiff's fibromyalgia impaired her "ability to sustain full time employment" and that Plaintiff could not "bend, stoop, or walk for long periods of time."  Tr. at 507.

In analyzing Plaintiff's RFC, the ALJ noted Dr. Obong's opinion, but indicated he did not give her opinion controlling weight because he found that "the medical evidence establishes that the claimant has the ability to perform a wide range of activities which suggest a capacity for at [sic] light work."  Tr. at 18.  The ALJ does not further discuss Dr. Obong's opinion, nor does he detail the medical evidence to which he refers.

In support of his argument that the ALJ appropriately discounted Dr. Obong's opinion, the Commissioner offers detailed citations to and discussion of portions of the medical record.  *See* Def.'s Br. at 20.  The Commissioner then offers his explanation of how these record excerpts support the ALJ's finding that Plaintiff could perform light work, Dr. Obong's opinion notwithstanding.  *Id.* at 21.

Although the snippets of evidence the Commissioner provides in its brief may support the ALJ's decision to discount Dr. Obong's opinion, such post-hoc rationalizations do not provide sufficient reason for the court to affirm the ALJ's decision. *See Knight v. Astrue*, C/A No. 9:07-3902-HFF, 2008 WL 5416423, (D.S.C. Dec. 30, 2008) (remanding in part because Commissioner's argument set forth in brief were impermissible post-hoc rationalizations that could not be used to affirm the

Commissioner's decision (internal citations omitted)). The ALJ should have provided this type of detailed analysis in his decision. Because he did not, the undersigned recommends remand so that the ALJ may fully consider the record evidence and detail the reasons for his findings. *See Harmon v. Astrue*, C/A No. 9:09-1964-DCN, 2010 WL 3786496, *6 (D.S.C. Sept. 21, 2010) (remanding because ALJ did not discuss treating physician's opinion regarding one of plaintiff's claimed impairments, noting that "[i]n order to reject a treating physician's opinion, the ALJ must *explain* the rationale for the rejection and provide persuasive contradictory evidence.") (emphasis in original) (internal quotation and citation omitted).

The Commissioner also details specific medical records from two orthopedists and one rheumatologist who treated Plaintiff, arguing that the ALJ appropriately may have given more weight to the findings of these medical specialists than to the opinion of Dr. Obong, a general practitioner. Def.'s Br. at 21. The Commissioner is correct that the Commissioner may appropriately afford specialists' opinions more weight at times. *See* 20 C.F.R. § 404.1527(d)(5). However, the ALJ did not refer to these findings from these specialists in his decision to afford less-than-controlling weight to Dr. Obong's opinion. In fact, the ALJ did not refer to them at all in his decision. For reasons set out above, the court will not consider the Commissioner's argument in conducting its appellate review of the ALJ's decision to discount Dr. Obong's opinion. On remand, the ALJ should provide detailed discussion of the weight he gives Dr. Obong's opinion. If part of the ALJ's consideration includes the findings of other medical sources, he should so indicate.

b.    Dr. Nylor

Plaintiff also argues that the ALJ improperly discounted the opinion of Dr. Nylor, her treating psychiatrist.  On May 1, 2007, Dr. Nylor completed questionnaires regarding Plaintiff's mental health.  Tr. at 476–81.  Dr. Nylor opined that Plaintiff suffered from an affective disorder manifested by disturbance of mood, as evidenced by anhedonia/pervasive loss of interest in almost all activities, appetite disturbance with weight change, psychomotor agitation/retardation, decreased energy, and difficulty concentrating/thinking.  Tr. at 476.  He indicated that Plaintiff was markedly restricted in her activities of daily living, had extreme difficulties maintaining social functioning and extreme deficiencies of concentration, persistence, and pace with one to two episodes of decompensation of extended duration. Tr. at 477.  He further indicated that Plaintiff had been unable to function outside a highly-supportive living arrangement for a year or more and that she continued to need such arrangement. Tr. at 478.  Dr. Nylor also opined that Plaintiff was markedly limited in her ability to do the following:  1) remember locations and work-like procedures, 2) understand and remember very short and simple instructions, 3) understand and remember detailed instructions, 4) carry out detailed instructions, 5) maintain attention and concentration for extended periods, and 6) sustain an ordinary routine without special supervision. Tr. at 480. Dr. Nylor also indicated that Plaintiff's ability to interact socially and to adapt to change was markedly limited.  Tr. at 481.

In his decision, the ALJ referenced Dr. Nylor's May 2007 opinion, finding it was not entitled to substantial weight because "it is not supported by [Dr. Nylor's] treatment notes and is contradicted by Plaintiff's own description of her activities." Tr. at 18. The ALJ does not include discussion of the evidence he found to be contradictory. Again, the Commissioner defends the ALJ's treatment of the opinion through detailed citation to record evidence that arguably supports the ALJ's determination that Dr. Nylor's opinion was inconsistent with his own notes. Def.'s Br. at 22–23.

As with the opinion of Dr. Obong, the Commissioner's post-hoc explanation of what evidence in Dr. Nylor's records may have contradicted his opinion is not sufficient to overcome Plaintiff's challenge. *See Knight v. Astrue*, 2008 WL 5416423. On remand, the ALJ should more fully discuss his analysis of Dr. Nylor's opinion and, if he rejects it, provide "persuasive contradictory evidence" to support his findings. *See Harmon*, 2010 WL 3786496 at *6.

### c. Ms. Higgins

Plaintiff also argues that the ALJ improperly discounted the opinion of Ms. Norma Lynn Higgins, Plaintiff's therapist. Pl.'s Br. at 14–15; Pl.'s Reply Br. at 3.[1] On May 18,

---

[1] In her initial brief, Plaintiff incorrectly argues that the ALJ rejected Ms. Higgins' opinion solely because she was not considered an "acceptable medical source" under the Commission's regulations. Pl.'s Br. at 15. The Commissioner properly pointed out that the ALJ considered and partially accepted Ms. Higgins' opinion, which Plaintiff acknowledged in her reply. Def.'s Br. at 22, Pl.'s Reply Br. at 15. Because all parties agree that the ALJ properly considered her opinion under the rubric of 20 C.F.R. 404.1513, the court need not further discuss the standard by which the ALJ should consider Ms. Higgins' opinion.

2007, Ms. Higgins offered her opinion by completing forms regarding Plaintiff's mental health and ability to perform in a job. Tr. at 496–502. She opined that Plaintiff suffered from an affective disorder manifested by disturbance of mood, as evidenced by anhedonia/pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation/retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating/thinking. Tr. at 496. She indicated that Plaintiff was mildly restricted in her activities of daily living, had marked difficulties maintaining social functioning and deficiencies of concentration, persistence, and pace with three episodes of decompensation of extended duration. Tr. at 497. She further indicated that Plaintiff had been unable to function outside a highly supportive living arrangement for a year or more and that she continued to need such arrangement. Tr. at 498. She also considered how Plaintiff functioned in various areas and found her to be markedly or moderately limited in most. Tr. at 501–02.

The ALJ indicated that he considered Ms. Higgins' opinion and gave it "partial weight" in that he found Plaintiff had moderate limitations in social functioning and was limited to work involving limited public contact. Tr. at 18–19. As with the opinions of Drs. Obong and Nylor, the undersigned recommends this matter be remanded and that, on remand, the ALJ clearly explain the weight he gave Ms. Higgins' opinion and the reasons for doing so.

3.    The ALJ Did Not Address Plaintiff's Neuropsychological Evaluation.

Plaintiff's final argument is that the ALJ's decision is not supported by substantial evidence because the ALJ did not consider all record evidence, nor did he adequately explain his reasons for arriving at his decision. Pl.'s Br. at 16–17. Plaintiff focuses this argument on the ALJ's overlooking the evaluation of Dr. Brian L. West, Ph.D., in determining Plaintiff's ability to work. Dr. West did a neuropsychological evaluation of Plaintiff on April 4 and 17, 2006. Tr. at 344–47. Dr. West found that Plaintiff "ha[d] a clear pattern of attention regulation concerns," most likely associated with sleep disturbance; "anxiety and depressive concerns," including a depressive episode and a PTSD of unknown origin; and "a blunted learning curve" affecting her ability to recall. Tr. at 344–47.

Plaintiff argues that, because the ALJ did not reference Dr. West's findings at all, the court cannot determine whether he considered such findings in reaching his conclusion that Plaintiff was not disabled. The Commissioner concedes that the ALJ did not address Dr. West's opinion in his decision, but argues that such error was harmless. Def.'s Br. at 23–25. The Commissioner's brief also offers analysis of Dr. West's findings, arguing that they support the ALJ's decision. Def.'s Br. at 24.

For the reasons discussed above, the Commissioner's post-hoc explanation of how the ALJ might have handled Dr. West's findings is not sufficient. Additionally, the court cannot find that the ALJ's wholesale failure to discuss Dr. West's findings is harmless error. *See generally Harmon*, 2010 WL 3786496 at *7 (finding harmless error analysis

inappropriate when ALJ failed to consider medical information). On remand, the undersigned recommends that the ALJ consider Dr. West's finding and explain his treatment of it.

III.    Conclusion and Recommendation

Based upon the foregoing, the court cannot conclude that the ALJ's decision to deny benefits was supported by substantial evidence. Therefore, it is recommended that the Commissioner's decision be reversed and remanded under sentence four of 42 U.S.C. § 405(g) for additional consideration as set out herein.

IT IS SO RECOMMENDED.

November 10, 2010                          Shiva V. Hodges
Florence, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**